UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARIEL BALTHROPE,<br><br>Plaintiff,<br><br>v.<br><br>SACRAMENTO COUNTY DEP'T OF HEALTH AND HUMAN SERVICES, et al.,<br><br>Defendants. | No. 2:10-cv-3003 KJM JFM (PS)<br><br>ORDER AND<br><u>FINDINGS & RECOMMENDATIONS</u> |

**I.  INTRODUCTION**

Plaintiff Ariel Balthorpe is proceeding pro se with this civil rights action pursuant to 42 U.S.C. § 1983.  The matter has been referred to the undersigned pursuant to Eastern District of California Local Rule 302(c)(21).  <u>See</u> 28 U.S.C. § 636(b)(1).  This action is proceeding on plaintiff's second amended complaint, filed May 14, 2012.  ECF No. 82.  Therein, plaintiff raises claims under the Fourth and Fourteenth Amendments as well as 42 U.S.C. §§ 1985 and 1986.  ECF No. 82.  Plaintiff also asserts that she has been unlawfully deprived of Social Security benefits, and she raises the following state law claims against various defendants:  intentional and negligent infliction of emotional distress, malicious prosecution, preparing fraudulent evidence, and violation of California Assembly Bill 490.  <u>Id.</u>  These claims arise from allegations of child abuse that were made by county officials against petitioner's father, allegedly falsely, and from

the ensuing juvenile dependency proceedings.  Id.

This matter is before the court on the motion of defendants County of Sacramento, Chris Bliss, David Burdette, Kenneth King, Kirsten Parske, Christina Juarez, Graciela Garcia, Gisella Wolfe and Rashida Green (collectively "defendants") for summary judgment pursuant to Fed. R. Civ. P. 56, filed on October 25, 2012.[1]  ECF No. 106.  Plaintiff filed an opposition on November 21, 2012 (ECF No. 110), and defendants filed a reply on December 5, 2012 (ECF No. 112).  The matter is submitted upon the record and briefs on file.  ECF No. 111; L.R. 230(g).  For the reasons stated herein, it is recommended that defendants' motion for summary judgment be granted on all of plaintiff's federal law claims, and on plaintiff's state law claims of preparing fraudulent evidence, malicious prosecution, embezzlement and disclosure of information from a "Child's Folder."  It is further recommended that plaintiff's remaining state law claims for intentional and negligent infliction of emotional distress and violation of California Assembly Bill 490 be dismissed without prejudice pursuant to 28 U.S.C. § 1367.

**II.     STANDARD FOR MOTION FOR SUMMARY JUDGMENT**

Summary judgment is appropriate when it is demonstrated that the standard set forth in Federal Rule of Civil procedure 56 is met.  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).[2]

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed. R. Civ. P. 56(c).)  "Where the nonmoving party bears the burden of proof at trial, the moving party need

---

[1] On January 26, 2012, defendants Sacramento Child Advocates, Inc., Robert Wilson, Rebekah Sass and Lisa Thor (sued as Lisa Presley) were dismissed from this action with prejudice.  See ECF Nos. 58 and 49.

[2] Federal Rule of Civil Procedure 56 was revised and rearranged effective December 10, 2010.  However, as stated in the Advisory Committee Notes to the 2010 Amendments to Rule 56, "[t]he standard for granting summary judgment remains unchanged."

only prove that there is an absence of evidence to support the non-moving party's case." Nursing Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.), 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp., 477 U.S. at 325); see also Fed. R. Civ. P. 56 Advisory Committee Notes to 2010 Amendments (recognizing that "a party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact"). Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex Corp., 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323.

Consequently, if the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of such a factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material in support of its contention that such a dispute exists. See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 630. Thus, the "purpose of summary judgment is to 'pierce

the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving a summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed. See Anderson, 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Matsushita, 475 U.S. at 587. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 586 (citation omitted).

### III.   DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants contend that plaintiff's claims are barred under principles of judicial estoppel, claim and issue preclusion, and absolute or qualified immunity. ECF No. 106-1. Defendants further contend that plaintiff's claims against defendant County of Sacramento regarding her Social Security funds and disclosure of information contained in a "Childs Folder" fail to state a claim upon which relief can be granted.[3] Id.

In her opposition, plaintiff does not address the principles of judicial estoppel, claim and issue preclusion and immunities set forth by defendants. Rather, plaintiff reasserts her allegations that defendants fabricated their reports and plaintiff's father did not abuse her. Plaintiff argues

---

[3] In their motion, defendants request that the court take judicial notice of more than fifteen documents. ECF Nos. 106-3 and 106-4. The documents submitted by defendants are of the type for which judicial notice is proper. Fed. R. Evid. 201. Specifically, the documents consist of matters filed as part of a court proceeding as well as matters of public record. Accordingly, defendants' request for judicial notice will be granted. Id.

4

against defendants' efforts to "re-litigate" the juvenile proceedings.[4]

A.     Undisputed Facts

The operative facts are primarily taken from defendants' statement of undisputed facts in support of their motion for summary judgment, including the declarations of Jeri L. Pappone, Christopher Bliss, David Burdette, Graciela Garcia, Rashida Green, Christina Juarez, Kenneth King, Kristen Parske, Scott Ryman, Gisella Wolfe, and other evidence cited therein.[5]

On the night of July 15, 2008, at approximately 1:15 in the morning, then 16-year-old plaintiff was approached by defendants Bliss, Burdette and King, who were responding to a complaint by a neighbor. Bliss Decl. ¶ 10; Burdette Decl. ¶ 10; King Decl. ¶ 10. Plaintiff had snuck out of her house and was in a park with her boyfriend. Bliss Decl. ¶ 11; Burdette Decl. ¶ 11; King Decl. ¶ 11; Balthrope Dep. 13:21-14:25 (ECF No. 106-6 at 2). Following a confrontation between plaintiff, her boyfriend and defendants Bliss, Burdette and King, regarding plaintiff's boyfriend's possession of a knife, plaintiff was taken into custody. Bliss Decl. ¶ 11; Burdette Decl. ¶ 11; King Decl. ¶¶ 11-12; Balthrope Dep. 15:2-5. Plaintiff brought defendants Bliss and Burdette to her home; no one answered the door, and plaintiff did not have a key. Bliss Decl. ¶ 12; Burdette Decl ¶ 12; Balthrope Dep. 17:6-8. Plaintiff also provided a phone number for her father that defendant police officers attempted to call without success. Bliss Decl. ¶ 12; Burdette Decl ¶ 12; Balthrope Dep. 18:20-21. After attempting to contact plaintiff's father by telephone and visiting his home, defendants Bliss and Burdette took plaintiff to the Children's Receiving Home at approximately 2:30 a.m. on July 15, 2008, for her protection pursuant to

////

---

[4] The court notes that plaintiff has attempted to raise brand-new claims in her opposition (i.e., for violations of "18 U.S.C. § 1746"), but her second amended complaint fails to even hint at these claims. Compare ECF No. 82 with ECF No. 110 at 29. These newly raised claims will not be considered in this procedural posture. The court further notes plaintiff mentions two defendants, Catherine Spinelli and Scott Ryman, who were not included in her operative second amended complaint. ECF Nos. 110-7 and 110-10. Allegations regarding these individuals will also be disregarded.

[5] Plaintiff failed to reproduce defendants' statement of undisputed facts pursuant to this court's local rules. See L.R. 260(b). Nor did plaintiff file a separate statement of disputed facts. Id. Therefore, any fact plaintiff failed to provide evidence to dispute is deemed undisputed.

California Welfare & Institutions Code § 305(a).[6] Bliss Decl ¶ 13; Burdette Decl. ¶ 13. While in custody at the Children's Receiving Home, plaintiff was interviewed by defendant Wolfe, a social worker. Plaintiff told Wolfe that her father was abusive, that her father would kill her, and "that her father pushed her to the ground in view of his girlfriend and the girlfriend did nothing." Wolfe Decl. ¶ 3. Defendant Juarez, a social worker, also interviewed plaintiff on July 15, 2008. Juarez Decl. ¶ 2. Defendant Juarez reported that plaintiff said "that her father is very mean to her[,] he yells at her, pushes her, grabs her and threatens to kill her." Juarez Decl. Ex. A. Defendant Juarez also reported that plaintiff said she wanted to stay at the Children's Receiving Home and "be safe." Id. Defendant Juarez attempted to contact plaintiff's father after the interview but was unsuccessful.[7] SUF ¶ 13. On July 16, 2008, Defendant Parske prepared an initial Juvenile Dependency Petition and a Detention Report for plaintiff's Detention Hearing, using statements plaintiff made to social workers during their interviews. Parske Decl. ¶¶ 3-4. The Juvenile Dependency Petition states in part that

> the father has a history of using excessive corporal punishment on the child and failing to adequately supervise her. Specifically, on or about May 8, 2008, the father used excessive corporal punishment on his child in that the father grabbed the child and pushed her down resulting in the child sustaining bruises to her arms. Further, the father has yelled, pushed and grabbed the child. The father has also threatened to kill the child. The child is nervous and scared of what her father will do to her next and is unable to sleep or eat. The child is in fear of calling law enforcement and/or Child Protective Services. The child feels unsafe and does not wish to see or return to her father's care. . . . The father's failure to provide adequate care places the child at substantial risk of physical harm, abuse and/or neglect.

---

[6] California Welfare & Institutions Code § 305(a) permits a police officer to take a minor into temporary custody, without a warrant, when the officer has reasonable cause for believing that the minor is a person described in Section 300, and, in addition, that the minor has an immediate need for medical care, or the minor is in immediate danger of physical or sexual abuse, or the physical environment or the fact that the child is left unattended poses an immediate threat to the child's health or safety. In cases in which the child is left unattended, the peace officer shall first attempt to contact the child's parent or guardian to determine if the parent or guardian is able to assume custody of the child. If the parent or guardian cannot be contacted, the peace officer shall notify a social worker in the county welfare department to assume custody of the child.

[7] As it turns out, plaintiff's father filed a missing persons report on July 15, 2008, at approximately 9:00 p.m. Ryman Decl. ¶ 9. Sometime after 3:00 p.m. on July 16, 2008, Officer Scott Ryman ("officer Ryman"), who is not a named defendant, learned that plaintiff was in custody at the Children's Receiving Home. Id. at ¶ 12. Officer Ryman informed plaintiff's father of plaintiff's location on July 16, 2008. Id. at ¶ 13.

Parske Decl. Ex. A.  The Detention Report reiterates the information provided in the Juvenile Dependency Petition, and further states that plaintiff "disclosed she is very depressed and sad and feels alone at home with her father."  Parske Decl. Ex. B.  The juvenile court relied on this report during plaintiff's July 17, 2008, detention hearing.

On July 17, 2008, defendant Wolfe met with plaintiff in person at Child Welfare Services and confirmed with her the allegations she made during her prior interviews with social workers.  Wolfe Decl. ¶ 4.  In defendant Wolfe's documentation of her July 17, 2008, interview she noted that plaintiff stated "[i]t's all true," and confirmed her father "has been hitting [her] off and on for the past eight years, with his first, and pushing [her] around and down on the ground."  Wolfe Decl. Ex. B.  Defendant Wolfe further documented plaintiff's statement that her father threatened to kill her and has told her that if she contacts the police he will get her and could kill her.  Id.  During defendant Wolfe's interview with plaintiff she also made allegations of sexual misconduct, and claimed her father did not want her to graduate high school because he wanted to continue receiving her Social Security checks.[8]  Id.

On July 17, 2008, the juvenile court held a detention hearing.  RFJN Ex. D.  Plaintiff, her attorney, plaintiff's father and his attorney attended the hearing.  Id.  The juvenile court read and considered the July 16, 2008, detention report prepared by the Department.  Id.  The juvenile court informed the parties, including plaintiff, "of the contents of the petition(s); the nature and possible consequences of juvenile court proceedings; the reason for the initial detention and the purpose and scope of the detention hearing."  Id.  The juvenile court found in part that "[a] prima facie showing has been made that [plaintiff] comes within the provisions of Welfare and Institutions Code Section 300."  Id.  The juvenile court further found that "[t]here is a substantial danger to the physical health of [plaintiff] and there are no reasonable means by which [plaintiff's] physical health may be protected without removing [her] from the parent's physical custody."  Id.  The juvenile court ordered, *inter alia*, the Department to conduct home evaluations with any relatives who come forward and to offer reunification services to the father.  Id.  The

---

[8] Plaintiff's mother passed away on April 5, 2000.  ECF No. 106-3 at 52.  As a result, it appears plaintiff was receiving monthly Social Security checks.  See ECF No. 106-3 at 53.

7

juvenile court further ordered that "[t]here shall be no placement of [plaintiff] without a court order." Id.  A Pre-Jurisdiction Status Conference hearing was scheduled for August 8, 2008.[9]  Id.

Following the juvenile court proceedings, defendant Wolfe interviewed plaintiff's maternal aunt and grandmother on July 23, 2008, and plaintiff's brother on July 24, 2008.  Wolfe Decl. ¶¶ 6-8.  Defendant Wolfe documented each of her interviews with plaintiff's family members.  Wolfe Decl. Ex. B.  Plaintiff's maternal grandmother confirmed with defendant Wolfe plaintiff was "afraid of her father and [she] does not want to be around her father."  Id.  On July 25, 2008, plaintiff's father and his girlfriend were also interviewed by social workers.  Id.  On August 1, 2008, defendant Wolfe prepared an Initial Case Plan in an effort to facilitate the juvenile court's goal of offering reunification services to plaintiff's father.  Wolfe Decl. ¶ 9.  On August 5, 2008, defendant Wolfe prepared a Jurisdictional/Disposition Report that was submitted to the juvenile court and used during the court's Contested Jurisdiction/Disposition Hearing.  Wolfe Decl. ¶ 10.  On August 7, 2008, defendant Juarez met for the last time with plaintiff.  Juarez Decl. ¶¶ 8, 11.  Defendant Juarez documented her interview with plaintiff and noted that "[s]he was scared that the Court may try to make her go back to her father."  Juarez Decl. Ex A.  Defendant Juarez further documented plaintiff stating, "I am scared he [plaintiff's father] will kill me and he has threatened to kill me if I do just what I am doing now telling you this."  Id. (internal quotations omitted).

At the Contested Jurisdiction/Disposition Hearing, which was held on September 16, 17, 22, and October 6, 2008, plaintiff testified about the circumstances leading up to the juvenile court proceedings.  Pappone Decl. Ex. A.  The following are excerpts from plaintiff's testimony:

> Q   And on or about July 15th did you sneak out of your father's home?
> A   I ran away.. . . .
> Q   . . . . So when the police arrived did you inform them that you had, in your words, ran away from home?
> A   Yeah, I let them know.

---

[9] On August 8, 2008, the Juvenile court held a Pre-Jurisdiction Status Conference.  RFJN, Ex. E.  The juvenile court set the matter for a Relative Placement Hearing on August 12, 2008, and a Contested Jurisdiction/Disposition Hearing on September 16, 2008.  Id.  On August 12, 2008, the court continued the Relative Placement Hearing to August 29, 2008.  Id.  Plaintiff was not in attendance at either of these hearings.  Id.

| | | |
|---|---|---|
| 1 | Q | Okay. Did they ask you any questions as to why you ran away from home? |
| 2 | A | I told them that my dad was a mean person and that I couldn't go back home.. . . . |
| 3 | Q | You told the social worker that around May 2008 your father hit you excessively; is that an accurate statement? |
| 4 | A | Yes. |
| | Q | Okay. Can you explain to me this excessive hitting? |
| 5 | A | I went skating, and I came home when skating was over, . . . I guess my dad was trying to call me, and my phone was dying so I couldn't - - like I couldn't answer it. And I came home. I was like, dad, were you trying to call me? He's like, yeah, I was trying to call you. Where - - where were you at? And then he comes in my room. . . . And I went in the room, and he came in there behind me, and he started yelling at me. He's like, where the F were you at and stuff like that. And then he grabbed my hair, threw me on the ground and punched me in my arm. His girlfriend was standing there the whole time watching. She didn't say anything. |
| 11 | Q | Did you tell anyone about this incident? |
| | A | I told Shawn [plaintiff's boyfriend at the time] and my grandma.. . . . |
| 12 | Q | And what did your maternal grandmother say? |
| 13 | A | She told me to call CPS. I didn't have the number, and I was very afraid to call CPS at the time. And not long after that, in June, that's when I ran away from home and actually did something about it by running away. . . . . |
| 15 | Q | . . . . Did you tell the social worker that if you call the cops your father would kill you? |
| 16 | A | Yes. |
| | Q | When did your father say that to you? |
| 17 | A | He said this around May, the time that he hit me. He said if I ever told the police or called CPS on him, took him to court, that he would kill me. He would get me back and he would kill me. |

Id. at 7-15. During her testimony plaintiff described other examples of physical abuse including her father slapping her in her face and pushing her. Id. at 16. When asked what she would do if the judge ruled that plaintiff needed to go home with her father, plaintiff stated that she "would probably run away." Id. at 19. Plaintiff described her father as "very mentally abusive to" her. Id. at 20. Plaintiff was questioned regarding the petition which stated that on July 8th her father "used excessive corporal punishment." Id. at 22. When asked if plaintiff believed that statement is true plaintiff responded, "Yes," and confirmed the July 8th incident was the "skating incident" described above. Id. Plaintiff was asked if her father ever threatened to kill her and she responded, "Yes, he has." Id. Finally, when asked if she wanted to return home and if she felt

safe at home, plaintiff responded, "No I don't." Id. Plaintiff's father's girlfriend also testified during the hearing as a witness. Id. at 32. When asked whether she would "be surprised to hear that [plaintiff] testified that [she] was a witness to an altercation in May where [plaintiff's father] punched [plaintiff] in the arm and pulled her by her hair," she testified that "[n]othing like that ever happened. . . . if anybody pushed her to the ground I would be sure it was probably her grandparents. It was probably her grandmother or maybe --" Id. Plaintiff interrupted this statement and exclaimed in open court, "She's lying." Id.

On October 6, 2008, the juvenile court found that the allegations of abuse as to plaintiff were true. RFJN, Ex. G. Plaintiff was in attendance during the juvenile court proceedings. Id. The juvenile court placed plaintiff in the home of her maternal aunt and scheduled a Pre-Permanency Hearing and a Permanency Hearing on March 6, 2009, and September 4, 2009, respectively.[10] Id.

Between August 2008 and January 2009, plaintiff frequently absconded from placement which resulted in a number of court proceedings as well as her being moved between her maternal aunt's home and different foster homes. Wolfe Decl. ¶¶ 11-16, Ex. B; Green Decl. ¶ 4, Ex. A. On January 26, 2009, defendant Wolfe interviewed plaintiff and documented that plaintiff said she never "wants to live with her father again," and that "he wants custody of her so that she can receive social security money from her mother's death." Wolfe Decl. Ex. B.

On February 27, 2009, after plaintiff absconded from placement, her counsel (former defendant Sass) recommended that a Protective Custody Warrant be issued for plaintiff. SUF ¶ 23. Defendant Green prepared a Warrant Data Sheet and Declaration. Green Decl. ¶ 4, Ex. B. The warrant was issued by the juvenile court on March 5, 2009. Green Decl. ¶ 5, Ex. C. The protective custody warrant was recalled on April 22, 2009, and plaintiff was placed with her father "on the condition that [the] father cooperate with [the Department] and comply with

---

[10] Plaintiff's father appealed the juvenile court's findings arguing, among other things, that the Department prosecuted a "false cause of action in initially accusing him of grabbing [plaintiff's] arms and bruising her." RFJN, Ex. H (internal quotations omitted). The California Court of Appeal, Third Appellate District, affirmed the lower court's findings in an unpublished fourteen page opinion, noting that "it was the juvenile court's responsibility to assess the credibility of the witnesses; and the court's findings reflect that it believed [plaintiff's] testimony that [her father] hit and bruised her arm in May 2008 after he became angry with her." Id.

services . . . " RFJN, Ex. K at 154. Ultimately, on February 5, 2010, the juvenile court terminated dependency. The court ruled in part as follows:

> While the father has not participated in services, and has demonstrated a disrespect for court orders, the evidence shows [plaintiff] is not at risk of abuse or neglect, is over 18 years of age and refusing to cooperate with DHHS or take advantage of services. DHHS reports submitted . . . show [plaintiff] . . . wishes to remain with the father, is able to care for and advocate for herself, has attended school, and refused counseling and ILP services. Placement with the father commenced in April of 2009 and since then only one referral for neglect has been filed, a claim of medical neglect, which the results of are unclear. Therefore, taking into account the totality of the evidence, this court cannot find by a preponderance of evidence that conditions still exist which would justify initial assumption of jurisdiction of that those conditions are likely to exist if supervision is withdrawn.

Id. at 173.

B. Discussion

    1. Claims Regarding Violations of Plaintiff's Father's Constitutional Rights

As a threshold matter, any claims set forth by plaintiff regarding a violation of her father's constitutional rights should be dismissed for lack of standing. See ECF No. 82 at 11 (alleging plaintiff's "father's educational rights were being violated"); ECF No. 82 at 12 (seeking damages for "[m]alicious prosecution against [plaintiff's] father"). The requirements for standing to sue are well-established. A party who seeks to establish standing must show (1) a concrete and imminent "injury in fact," (2) a causal connection between the defendants and the alleged injury, and (3) a likelihood that the injury will be redressed by a favorable decision. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992); Bernhardt v. County of Los Angeles, 279 F.3d 862, 868 (9th Cir. 2002). "[A]t an irreducible minimum, Art[icle] III [of the United States Constitution] requires the [plaintiff] to 'show that he personally has suffered some actual or threatened injury . . .'" Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc., 454 U.S. 464, 472 (1982) (quoting Gladstone Realtors v. Village of Bellwood, 441 U.S. 91, 99 (1979); see also Lujan, 504 U.S. at 560 & n.1 (holding that an "injury in fact" "must affect the plaintiff in a personal and individual way").

"It is well established that the federally protected rights that are enforceable under § 1983 are 'personal' to the injured party." Rose v. City of Los Angeles, 814 F.Supp. 878, 881 (C.D.

1   Cal. 1993). Here, plaintiff cannot assert a claim based on a violation of the "educational rights"
2   of her father. See Archuleta v. McShan, 897 F.2d 495, 497 (10th Cir. 1990) ("a section 1983
3   claim must be based upon the violation of plaintiff's personal rights, and not the rights of
4   someone else"). To the extent plaintiff alleges her father suffered a violation of his "educational
5   rights," that claim should be dismissed for lack of standing. See Estate of Zachary v. County of
6   Sacramento, No. 2:06-cv-01652-MCE-PAN, 2007 WL 1994226, at *3 (E.D. Cal. July 5, 2007)
7   (citing additional cases).

8   With regard to plaintiff's malicious prosecution claim, plaintiff has failed to show that her
9   personal rights were violated as a result of an action commenced against her father. See Estate of
10  Tucker ex rel. Tucker v. Interscope Records, Inc., 515 F.3d 1019, 1030 (9th Cir.) (setting forth
11  the elements of a malicious prosecution claim under California law) (citing Zamos v. Stroud, 32
12  Cal.4th 958 (Cal. 2004)), cert. denied, 555 U.S. 827 (2008). Therefore, plaintiff's malicious
13  prosecution claims should also be dismissed for lack of standing.

14          2. Police Officer and Social Worker Defendants

15  As noted above, these defendants seek summary judgment on the grounds of judicial
16  estoppel, collateral estoppel and absolute or qualified immunity. For the reasons now explained,
17  the court finds that the doctrine of judicial estoppel should bar plaintiff's claims against
18  defendants Bliss, Burdette, King, Parske, Juarez, Garcia, Wolfe and Green. Therefore, the court
19  need not and will not address the issues of collateral estoppel or absolute or qualified immunity.

20              a. Legal Standards for Judicial Estoppel

21  "Judicial estoppel is an equitable doctrine that precludes a party from gaining an
22  advantage by asserting one position, and then later seeking an advantage by taking a clearly
23  inconsistent position." Hamilton v. State Farm Fire & Cas. Co., 270 F.3d 778, 782 (9th Cir.
24  2001) (citations omitted). Judicial estoppel is invoked "not only to prevent a party from gaining
25  an advantage by taking inconsistent positions, but also because of general considerations of the
26  orderly administration of justice and regard for the dignity of judicial proceedings, and to protect
27  against a litigant playing fast and loose with the courts." Hamilton, 270 F.3d at 782 (internal
28  citation and quotations omitted). "[T]he application of judicial estoppel is not limited to bar the

assertion of inconsistent positions in the same litigation, but is also appropriate to bar litigants from making incompatible statements in two different cases." Id. at 783 (citing Rissetto v. Plumbers and Steamfitters Local 343, 94 F.3d 597, 605 (9th Cir. 1996)) .

In determining whether to apply judicial estoppel, a court may consider (1) whether the party's later position was inconsistent with its initial position; (2) whether the party successfully persuaded the court to accept its earlier position; and (3) whether the party would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped from asserting the inconsistent position. New Hampshire v. Maine, 532 U.S. 742, 750-751 (2001). The Ninth Circuit restricts the application of judicial estoppel "to cases where the court relied on, or 'accepted,' the party's previous inconsistent position." Hamilton, 270 F.3d at 783. Judicial estoppel prevents "'intentional self-contradiction . . . as a means of obtaining unfair advantage.'" State of Ariz. v. Shamrock Foods Co., 729 F.2d 1208, 1215 (9th Cir. 1984) (quoting Scarano v. Central R. Co. of New Jersey, 203 F.2d 510, 513 (3rd Cir.1953)) (alteration original), cert. denied, 469 U.S. 1197 (1985).

      b. Application of Judicial Estoppel

With regard to the first factor, plaintiff's present position with respect to abuse by her father is clearly inconsistent with her position in the juvenile court proceedings that her father abused her. Plaintiff testified under oath during the juvenile court proceedings that her father hit her excessively and threatened to kill her. Pappone Decl. Ex. A at 7-15. Specifically, plaintiff was presented with the following question while testifying: "You told the social worker that around May 2008, your father hit you excessively; is that an accurate statement?" Id. at 13. Plaintiff responded, "Yes." Id. Plaintiff was also asked if she told the social worker that if she called the police her father would kill her. Id. at 15. Plaintiff responded, "Yes." Id. When responding to these questions, plaintiff articulated details that supported her position that her father was abusive, and confirmed that she shared this information with social workers. As to defendant police officers, plaintiff testified under oath that she told the police officers she ran away from home the night of July 15, 2008. Id. at 9. Plaintiff further testified under oath that she told the police officers her "dad was a mean person and . . . [she] couldn't go back home." Id.

13

1  Plaintiff now asserts in this civil rights action that her father did not abuse her, and that
2  defendants fabricated the accusations that led to the juvenile court proceedings.  These positions
3  are clearly inconsistent.
4         Second, plaintiff succeeded in persuading the juvenile court that her father abused her.
5  The juvenile court accepted her assertions of abuse in reaching its finding that a substantial
6  danger to her physical health existed and required removal from her father's physical custody.
7  RFJN, Ex. D.  Following the Contested Jurisdiction/Disposition Hearing, the juvenile court
8  sustained the allegations as to plaintiff.  RFJN, Ex. G.  The court based its findings on the
9  following facts:

> [T]he father has a history of using excessive corporal punishment on the child and failing to adequately supervise her.  Specifically, on or about July 8, 2008, the father used excessive corporal punishment on his child in that the father grabbed the child and pushed her down resulting in the child sustaining bruises to her arms.  Further, the father has yelled, pushed and grabbed the child, The father has also threatened to kill the child.  The child is nervous and scared of what her father will do to her next and is unable to sleep or eat.  The child is in fear of calling law enforcement and/or Child Protective Services.  The child feels unsafe and does not wish to see or return to her father's care.  In addition, on July 15, 2008, the child snuck out of the father's home at 11:00 pm and was discovered in a park at 2:30 in the morning by Sacramento Sheriffs Officer C. Bliss, wandering the streets with a nineteen year old male.  The child did not have a key to get into the father's residence, nor a working telephone number to locate the father.  There was no answer at the father's residence when law enforcement transported the child home. The father's failure to provide adequate care places the child at substantial risk of physical harm, abuse and/or neglect.

21  Id.
22         This holding establishes that plaintiff succeeded in persuading the juvenile court to accept
23  her position that her father was abusive, that she feared her father, that she communicated these
24  facts to defendant police officers when they found her unattended at 2:30 in the morning, and that
25  their discovery of her warranted a finding of an immediate threat to her safety.  The California
26  Court of Appeal, Third Appellate District, affirmed the juvenile court's findings noting that "it
27  was the juvenile court's responsibility to assess the credibility of the witnesses; and the court's
28  findings reflect that it believed [Plaintiff's] testimony that [her father]" abused her.  RFJN, Ex. H.

14

1  Plaintiff failed to clarify during the juvenile court proceedings whether she was lying about any of
2  the allegations of abuse, despite many opportunities to do so.

3        To the contrary, plaintiff affirmed her accusations throughout the duration of the juvenile
4  court proceedings which lasted approximately two years.  Plaintiff attended most of the juvenile
5  court proceedings where her statements were repeated and subsequently relied on by the juvenile
6  court.  Moreover, plaintiff detailed her allegations of abuse under oath during her testimony at the
7  Contested Jurisdiction/Disposition Hearing.  She cannot now assert in these proceedings that the
8  allegations she made under oath in the state court proceedings were false and that the
9  contradictory statements she asserts in this action are in fact the truth.  See, e.g., Yeo v. Cohen, 6
10 F.2d 411, 411 (D. Mass. 1925) ("It is well settled that a party who falsely testified to a fictitious
11 state of facts for his own benefit will not, when his interest changes, be heard to say what the facts
12 really were.").  Allowing plaintiff to prevail in this litigation "would create the perception that
13 either prior courts or we have been misled by [plaintiff's] representations."  Milton H. Greene
14 Archives, Inc. v. Marilyn Monroe LLC, 692 F.3d 983, 1000 (9th Cir. 2012).  Were this court to
15 now accept that plaintiff was not in fact abused by her father, the "risk of inconsistent court
16 determinations . . . would become a reality."  New Hampshire, 532 U.S. at 755 (internal quotation
17 and citation omitted).  "The need to preserve the dignity of judicial proceedings weighs heavily
18 against allowing [plaintiff] to proceed down [her] newly charted path."  Milton H. Greene
19 Archives, Inc., 692 F.3d at 1000.

20       Finally, the court finds that plaintiff would derive an unfair advantage or impose an unfair
21 detriment if not estopped in this action.  Plaintiff consistently asserted from the time she first
22 encountered defendant police officers, and throughout the duration of the juvenile court
23 proceedings, that her father abused her.  She is now asserting in this federal civil action that he
24 did not abuse her.  Defendants relied on plaintiff's accusations when taking her into protective
25 custody and initiating child protective judicial proceedings.  To now require these defendants to
26 defend a lawsuit seeking damages from them for doing so would impose an unfair detriment.

27       For the foregoing reasons, the court will recommend that defendants Bliss, Burdette,
28 King, Parske, Juarez, Garcia, Wolfe and Green's motion for summary judgment should be

1 granted.

2         3.      <u>Defendant County of Sacramento</u>

3 Defendants argue that plaintiff's claims against the County of Sacramento -- that it
"embezzled" her deceased mother's Social Security Insurance payment and improperly disclosed
information from a "Child's Folder" -- are without merit and fail to state claims upon which relief
can be granted.

7 As discussed above, the juvenile court relied on plaintiff's accusations in finding there
was a substantial danger to plaintiff's safety, and therefor requiring removal of physical custody
from her father and adjudging her a dependent child of the Sacramento County Juvenile Court.
RFJN Ex. G.  Once plaintiff was committed to the custody of the County of Sacramento, the
County had a responsibility to provide her with physical care and maintenance.  As a result, it was
entitled to receive compensation for the reasonable costs of caring for plaintiff.  Cal. Wel. & Inst.
Code § 903.  Sources of funds available to the County of Sacramento while a child is in its
custody include Social Security benefits a child may receive.  See <u>Washington State Dept. of
Social and Health Services v. Guardianship Estate of Keffeler</u>, 537 U.S. 371, 376 (2003) (citing
42 U.S.C. §§ 405(j)(1)(A), 1383(a)(2)(A)(ii)(I); 20 CFR §§ 404.2001, 404.2010, 416.601,
416.610).  Plaintiff was clearly deemed a dependent child of the County of Sacramento, which in
turn was entitled to receive her Social Security benefits as compensation for the cost of plaintiff's
physical care and maintenance.  Thus, the court finds that plaintiff's allegations that the County of
Sacramento "embezzled" her Social Security benefits are without merit, and recommends that this
claim be dismissed.

22 With regard to disclosure of the "Childs Folder" containing information pertaining to
plaintiff's care, plaintiff has failed to set forth any facts that indicate the County of Sacramento
disclosed any information to third parties other than foster parents.  ECF No. 82 at 10-11.  Rather,
plaintiff alleges that information pertaining to her care was given to foster parents in a "'Childs
Folder' to which foster parents would read these allegations defendant had wrote." <u>Id.</u>  Plaintiff
alleges the statements "caused repercussions in that friends of theses [sic] foster parents had
confronted [her]." <u>Id.</u> at 11.  Plaintiff fails to make any allegations that the County of Sacramento

16

disclosed information in her "Childs Folder" to third parties.  Further, the court is not aware of any authority, and plaintiff has provided none, that provides for a cause of action against a county when a foster parent discloses information pertaining to a foster child to a third party.  Therefore, the court finds that plaintiff's claim fails, and recommends that it be dismissed.

          4.        <u>Remaining State Law Claims</u>

The complaint includes two additional state law claims that are not addressed by these findings and recommendations.  Those claims are for intentional and negligent infliction of emotional distress and violation of California Assembly Bill 490.  In light of the court's recommendation to dismiss all of plaintiff's federal law claims, the court will recommend that these two remaining state law claims be dismissed without prejudice pursuant to 28 U.S.C. § 1367.

**IV.    CONCLUSION**

Accordingly, IT IS HEREBY ORDERED that defendants' request for judicial notice as stated in their motion for summary judgment (ECF Nos. 106-3 and 106-4) is granted.

Furthermore, IT IS HEREBY RECOMMENDED that:

1. Defendants' motion for summary judgment (ECF No. 106) be granted as to plaintiff's federal law claims and plaintiff's state law claims of preparing fraudulent evidence, malicious prosecution, embezzlement and disclosure of information from a "Child's Folder;" and

2. Plaintiff's remaining state law claims for intentional and negligent infliction of emotional distress and violation of California Assembly Bill 490 be dismissed without prejudice pursuant to 28 U.S.C. § 1367.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be filed and served within seven days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal

1 | the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

2 | DATED: August 30, 2013

_____
ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE

balt3003.sj